JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Ramon Abercrombie ("defendant"), appeals following his convictions and sentence for murder in violation of R.C.2903.02(A) with a firearm specification; aggravated murder in violation of R.C. 2903.01(B) with firearm, mass murder, and felony-murder specifications; two counts of aggravated robbery in violation of R.C.2911.01(A)(1) with firearm specifications; two counts of aggravated robbery in violation of R.C. 2911.01(A)(3) with firearm specifications; and attempted murder in violation of R.C. 2923.02 and 2903.02(A) with a firearm specification. Defendant asserts that he was denied the effective assistance of counsel and that improper victim-impact evidence was admitted during the guilt phase of the trial. For the reasons that follow, we affirm.
 {¶ 2} On June 16, 2006, Marquis McCalep ("Marquis") and his step-brother, Anthony Brown ("Anthony"), were shot in the basement of a Harvard Road apartment complex. Anthony died, but Marquis was able to walk down Harvard Road and was aided by a motorist, who called an ambulance. Marquis was treated at Metro Hospital for four gunshot wounds to his ankle, arm, back, and neck. Police found Anthony dead at the crime scene.
 {¶ 3} Marquis identified the shooter as defendant. Marquis and Anthony had attended school with the defendant. That night, the three were "battle rapping" and sharing two 40-ounce beers in the basement. Marquis saw defendant extend his arm with a small silver pistol and say, "You all are stupid. What you all got?" Marquis took this to mean he and his brother were being robbed. *Page 4 
 {¶ 4} Anthony began walking toward defendant believing he was not serious. Defendant shot Anthony. Marquis walked over and emptied his pockets, dropped to his knees, and laid face flat on the basement floor. Defendant then began shooting him. Marquis was shot in the ankle, back, left arm, and the back of his head. Defendant ran up the steps. Marquis then went to a female's apartment and told her Anthony had been shot. Then, he started walking up Harvard to get help. He was taken by ambulance to Metro Hospital.
 {¶ 5} Marquis and Anthony both attended Charles W. Elliot Middle School with the defendant and knew him from school. Marquis testified that he "instantly" identified defendant from a photo array.
 {¶ 6} Other tenants from the apartment complex confirmed hearing shots and calling 911.
 {¶ 7} Various expert witnesses testified at trial, including Carey Martin, a forensic scientist from the Cuyahoga County Coroner's Office, who analyzed various DNA samples. In particular, Ms. Martin examined a swab taken from the mouth of a beer bottle that was recovered from the scene and was designated as 25.1 in Ms. Martin's report. From the swab, Ms. Martin was able to extract a DNA profile. Ms. Martin also analyzed and compared samples from a swab off of the basement floor of the crime scene and a swab taken from the second-floor hallway. She compared the samples to the DNA standards of victim Anthony Brown and defendant. The DNA profile obtained from item 25.1, the swab from the malt liquor bottle, was a *Page 5 
"mixture," i.e., a combination of more than one person's DNA. Ms. Martin could not exclude defendant as a possible contributor to that mixture. Ms. Martin explained, "saying I can't exclude them says that when I looked at their genetic profiles next to the mixture, I can see their DNA profile in that mix, so I can't exclude them as being a possible contributor to that mixture."
 {¶ 8} The swabs from the basement floor and the second-floor hallway did not match either Brown's or defendant's DNA profile.
 {¶ 9} The trial court granted defendant's motion for an independent lab analysis. However, due to the reported weakness of the sample, Ms. Martin's testing did not allow for an independent test. Ms. Martin sent all the samples, along with various other information, including the sources used in rendering her opinion, to a lab that was selected by the defense. The defense chose not to offer an expert witness as to the DNA evidence.
 {¶ 10} The defendant's motion in limine to exclude the report and testimony of Ms. Martin was denied. Defense counsel cross-examined Ms. Martin and questioned her qualifications, the qualifications of the lab itself, and the reliability of her DNA analysis. Counsel established that at the time Ms. Martin performed the DNA analysis in this case, her lab was not accredited. Counsel established that Ms. Martin's testing consumed the DNA sample, leaving none for an independent test.
 {¶ 11} On redirect, Ms. Martin explained that "the sample was going to be weak, it was a very weak sample even though both portions of the swabs were used, *Page 6 
which was done because of the nature of the sample." Ms. Martin denied making a conscious decision to use the sample all up and maintained that if she would not have had to use both ends of the swab, she would not have done so. Jeanie McCalep testified briefly at the trial. She is the mother of both victims. Her testimony established the schools that the victims attended and the years of attendance. Ms. McCalep did not testify about the impact of her son's death and/or her other son's injuries.
 {¶ 12} A paralegal from the Cleveland Municipal School District confirmed that the victims and the defendant all attended Charles Elliot Middle School in the 2000/2001 school year. Further, victim Anthony Brown and the defendant were in the same section.
 {¶ 13} After the jury returned its verdict, the trial court sentenced defendant to 15 years on count one, life without parole on count two, nine years on counts three, four, five, and six, and ten years on count seven. Counts one, two, three, and five were merged, as were counts four, six, and seven. Defendant is serving consecutive sentences on the separately merged counts, which is a 16-year sentence, followed by a term of life in prison without the possibility of parole. All counts also included a three-year firearm specification to be served prior and consecutive to the previously identified sentence.
 {¶ 14} Defendant's appeal follows.
 {¶ 15} "I. The appellant was denied effective assistance of counsel at trial." *Page 7 
 {¶ 16} To establish a claim of ineffective assistance of counsel, defendant must show two components: (1) "`that counsel's performance was deficient'"; and (2) `"that the deficient performance prejudiced the defense.'" State v. Kole, 92 Ohio St.3d 303, 2001-Ohio-191, quotingStrickland v. Washington (1984), 466 U.S. 668, 687. However, appellate review of counsel's performance must be highly deferential. Id. There is a strong presumption that counsel's performance constituted reasonable assistance. State v. Foust, 105 Ohio St.3d 137, 151, 2004-Ohio-7006, T|79.
 {¶ 17} Defendant asserts that he was denied the effective assistance of counsel because his defense team did not obtain an expert to challenge "the procedure of methodology of the DNA test results." This, he argues, resulted in his counsel's inability to conduct a meaningful cross-examination of the DNA expert contrary to the dictates ofUnited States v. Cronic (1984), 466 U.S. 648, 656, which provides, "[t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted-even if defense counsel may have made demonstrable errors — the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Page 8 
 {¶ 18} Defendant has not established either prong of an ineffective assistance claim based on the record before us.
 {¶ 19} The Ohio Supreme Court has found that "[questions regarding the reliability of DNA evidence in a given case * * * go to the weight of the evidence rather than its admissibility." Foust, 2004-Ohio-7006, ¶ 85. In Foust, the court addressed claims of ineffective assistance of counsel relating to DNA evidence and testimony that is similar to that found in this case. In Foust, the forensic scientist tested the DNA material with the Short Tandem Repeat ("STR") method, which is the same scientific method that was used by Ms. Martin. The Ohio Supreme Court held that "`the failure to challenge the admissibility of such evidence cannot be considered ineffective assistance of counsel'" as the Court continues to recognize that `"the theory and procedures used in DNA typing are generally accepted within the scientific community.'" Id. at ¶ 81, quoting State v. Nicholas (1993), 66 Ohio St.3d 431, 437 andState v. Pierce (1992), 64 Ohio St.3d 490, 497.
 {¶ 20} Here, defendant is not challenging the admissibility of the DNA evidence but is instead asserting a failure to submit an expert opinion criticizing Ms. Martin's methodology. Yet, there is no indication that the methodology utilized by Ms. Martin were flawed and/or no evidence that an expert would testify to that effect. Ms. Martin indicated that she forwarded her test results and sources to the lab in Cincinnati.
 {¶ 21} Defense counsel's decision not to call an expert to testify as to methodology was a tactical decision. For example, it is possible that an expert *Page 9 
witness on this topic may have approved the methodology and thereby bolstered the prosecution's case. E.g., Foust, 2004-Ohio-7006, T|83.
 {¶ 22} Although Ms. Martin's test consumed all of the DNA material and deprived the defense of obtaining an independent test, she testified that she did not consciously decide to use the whole sample. If she would not have had to use both ends of the swab, she would not have done so. The defense thoroughly cross-examined her on this issue.
 {¶ 23} Unless a criminal defendant can show bad faith, the State's failure to preserve potentially useful evidence — of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant — does not constitute a violation of the due process clause of the United States Constitution'sFourteenth Amendment. Arizona v. Youngblood (1988), 488 U.S. 51. There is no evidence that the consumption of the DNA evidence by the State's testing was the result of bad faith.
 {¶ 24} Further, "the Due Process Clause of the Fourteenth Amendment does not require the prosecution to preserve samples for independent analysis unless the sample possesses an exculpatory value that is apparent before the sample is destroyed, and the defendant is unable to obtain comparable evidence by other reasonably available means."State v. Estep (1991), 73 Ohio App.3d 609, 612. This Court must consider whether the destruction of the DNA material was intentional, the strength of the State's case if the defense could have conducted an independent *Page 10 
analysis of the DNA material, and the possible exculpatory value of the lost or destroyed evidence. California v. Trombetta (1984),104 S.Ct. 2528, 2533.
 {¶ 25} Here, Ms. Martin explained that due to the weakness of the sample, she felt it necessary to use both ends of the swab to have a chance of obtaining a result. She used only what she felt necessary to yield a result. Further, the consumption of the entire sample of DNA by the State's expert can be scientifically justified such that it does not violate due process. See e.g., State v. Leggett (Sept. 4, 1998), Williams County App. No. WM-97-029. Even if an independent test had resulted in the exclusion of defendant's DNA as a possible contributor to the DNA found at the crime scene, the State had a strong case with the testimony of the surviving victim, who knew the defendant. Finally, the possible exculpatory value of the destroyed DNA material would have been minimal. At best, it would only have excluded defendant as a possible contributor to the DNA material found on a beer bottle from the crime scene. He would still have had to overcome the surviving victim's testimony that identified defendant as the shooter.
 {¶ 26} After reviewing the record, defendant's spoliation claim lacks merit since there is no evidence that the State or the Coroner's office failed to preserve and/or consumed the entire sample of the DNA material in bad faith.
 {¶ 27} Defendant's first assignment of error is overruled.
 {¶ 28} "II. The State improperly adduced victim-impact evidence during the culpability determination phase of trial." *Page 11 
 {¶ 29} Defendant maintains that the trial court erred by allowing improper victim-impact evidence during the guilt phase of his trial. Specifically, defendant challenges the testimony of Jeanie McCalep, the victims' mother.
 {¶ 30} Defendant argues that this witness was called solely to adduce the emotional impact on a mother who had just lost her son. However, Jeanie McCalep's testimony was very brief. She is the mother of both victims. Her testimony established the schools that the victims attended and the years of attendance. This corroborated other evidence that was presented during the trial that the victims knew the defendant from school.
 {¶ 31} Jeanie McCalep did not give any testimony about the impact that the crimes had upon her or her family. Accordingly, her testimony does not qualify as improper "victim-impact evidence" as described inState v. Fautenberry (1995), 72 Ohio St.3d 435 and Payne v. Tennessee(1991), 501 U.S. 808.
 {¶ 32} Assignment of Error II is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. *Page 12 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ANTHONY O. CALABRESE, JR., J., and CHRISTINE T. McMONAGLE, J., CONCUR. *Page 1